**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

The Meyers Printing Companies, Inc.,
d/b/a Meyers Printing Company
a/k/a Meyers,

        Plaintiffs,

  v.                                      **MEMORANDUM OPINION AND**
                                          **ORDER**
                                          Civil No. 06-255 ADM/AJB

Desa, LLC and Echo, Incorporated,

        Defendants.

Echo, Incorporated,

        Third Party Plaintiff,

  v.

Techtronic Industries North America, Inc.,

        Third Party Defendant.

Desa, LLC,

        Third Party Plaintiff,

  v.

Techtronic Industries North America, Inc.,

        Third Party Defendant.

Michael P. Coaty, Esq., Coleman, Hull & van Vliet, PLLP, Minneapolis, MN, argued on behalf of The Meyers Printing Companies, Inc.

Lester I. Adams, Jr., Esq., Pedley Zielke Gordinier & Pence, PLLC, Louisville, KY, argued on behalf of Desa, LLC; John B. Stanis, Esq., Masuda, Funai, Eifert & Mitchell, Ltd., Schaumburg, IL, argued on behalf of Echo Incorporated; J. Alison Morris, Esq. and Justin H. Perl, Esq., Maslon Edelman Borman & Brand, LLP, Minneapolis, MN, argued on behalf of Techtronic Industries North America, Inc.

## I. INTRODUCTION

On June 27, 2007, the undersigned United States District Judge heard oral argument on Defendant Desa, LLC's ("Desa") Motion for Summary Judgment [Docket No. 46] and Defendant Echo, Incorporated's ("Echo") Motion for Summary Judgment [Docket No. 51]. In its Complaint [Docket No. 1], Plaintiff The Meyers Printing Companies, Inc. ("Meyers") asserts claims for breach of contract, account stated, and unjust enrichment against Desa and Echo (collectively "Defendants"). For the reasons set forth herein, Defendants' Motions are granted in part and denied in part.

## II. BACKGROUND[1]

Meyers is a Minnesota corporation with its principal place of business in Minneapolis. Compl. ¶ 1. Meyers produces point-of-purchase displays that are installed in retail stores such as The Home Depot ("Home Depot"). Carron Dep. [Docket No. 58] at 10. Desa is a foreign corporation with its principal place of business in Bowling Green, Kentucky. Desa's 3d Party Compl. [Docket No. 27] ¶ 1. Echo is an Illinois corporation with its principal place of business

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

in Lake Zurich, Illinois.  Echo's 3d Party Compl. [Docket No. 24] ¶ 1.  Third Party Defendant Techtronic Industries North America, Inc. ("TTI") is foreign corporation with its principal place of business in Anderson, South Carolina.  Id. ¶ 2; TTI's Answer to Echo's 3d Party Compl. [Docket No. 36] ¶ 2.  Desa, Echo, and TTI are competitors who manufacture and sell outdoor power equipment, including trimmers, clippers, blowers, and chain saws, to retailers such as Home Depot.

In early 2004, Home Depot decided to change, or "reset," the displays for the outdoor power equipment in its stores.  Home Depot decided to reset the displays because customers haphazardly returned the products to the shelves, creating a disorderly appearance.  Moore Dep. [Docket No. 60] at 22-23.  In March 2004, Home Depot asked Steve Moore ("Moore"), Director of Marketing of TTI's Outdoor Products Division, to design new displays for Home Depot's outdoor power equipment.  Id. at 12, 23-24.  In May 2004, Moore presented a design proposal to Home Depot, and further revisions were made.  Id. at 32-33.

Around this time, Home Depot asked Moore if TTI would serve as the "category captain" of the reset project.  Id. at 27.  As category captain, TTI would "get a good, suitable working design developed, presented, approved by all parties [including other outdoor power equipment manufacturers], produced, and launched" in Home Depot's approximately 1,600 stores.  Id. at 32.  By July 2004, Home Depot informed DESA, Echo, and other outdoor power equipment manufacturers that the in-store displays would be reset, and that TTI would be the captain of the reset project.  Id. at 33-34.  In addition to TTI, Desa, and Echo, the outdoor power equipment manufacturers involved in the reset project were Black & Decker, Toro, MTD, and Electrolux Home Products (all the manufacturers collectively are the "Home Depot Vendors").

Home Depot and the Home Depot Vendors agreed on a display design that required the manufacture and installation of product display pods that would hold each company's specific products.  See Desa Ex. [Docket No. 49] C-1 to C-4.[2]  By early September 2004, Moore solicited quotes from printing companies for production of the new displays and accompanying printed materials, and shipment to Home Depot's stores.  Moore Dep. at 47.  Moore also sought a company that would serve as "the bank," meaning that the company selected would secure partial payment from each of the Home Depot Vendors to comprise the total cost.  Id. at 58, 103, 132.  By early October 2004, Moore selected Meyers to produce and ship the displays because Meyers submitted the lowest quote and Meyers agreed to be "the bank."  Id. at 54-55, 59.

On October 7 and 8, 2004, Home Depot and the Home Depot Vendors met at Home Depot's Innovation Center in Atlanta, Georgia, to review prototypes of the new reset displays.  Id. at 38-39.  In a letter attached to an October 29, 2004, email, Moore informed the Home Depot Vendors that Meyers would produce the displays.  The letter stated in part:

> Hello everyone.  As we draw near to the important start of final production deadlines for the 3,200 blower bay kits, the 3,200 chain saw bay kits and the estimated 1,750 Hedge Trimmer Bay kits, all scheduled for the Jan. -Feb. '05 reset period, I wanted to also get you on-board with the selected supplier.
>
> Familiar to most of you, Meyers Display out of Minneapolis, is a top-notch, ISO Certified, P.O.P. [point of purchase] producer.  The primary benefit of having them work on behalf of all of us is not only their winning quote, but their high quality end product and the under-one-roof capability that we need at this time.  With the bay back wall and wing graphics, the vacuum-formed product troughs/cradles, and the C-Channel and Fact Tag (card) material all coming from one source, our efficiency is maximized.
>
> From the latest changes to the design set-up that came from our recent Atlanta meeting, we are reviewing the final costs and how that will affect each company.  Scott Carron of Meyers will be in touch with each of you to set up "your account."  Your share of the respective bay expense will be reworked per the (latest) line-up mix, per category, as

---

[2] Unless otherwise specified, all references to a "Desa Ex." are to Docket No. 49.

confirmed by Jeanine Huebner [of Home Depot], straight and simple. We foresee no surprises with this product based allocation.

Dep. Ex. 20 [Docket No. 54]. Scott Carron ("Carron"), Meyers' account executive for the reset project, also received the email and the letter. Id.; Carron Dep. at 11.

In mid-November 2004, the Home Depot Vendors again met at Home Depot's Innovation Center. Dep. Ex. 45 (Desa Ex. E). In a November 18, 2004, memorandum, Victoria Michal ("Michal"), Director of Sales for TTI's Outdoor Products Group, provided the other Home Depot Vendors with Meyers' estimates of the cost of the new displays. Dep. Ex. 6 [Docket No. 54]. Carron of Meyers received a copy of the memorandum, which estimated that the total cost would be $299,131 for the blower displays, $274,044 for the chain saw displays, and $42,770 for the hedge trimmer displays, for a total cost of $615,945. Dep. Ex. 6; Carron Dep. at 51. Desa's estimated share was $82,213 for the chain saw displays and $5,346 for the hedge trimmer displays, for a total of $87,559. Dep. Ex. 6. Echo's estimated share was $86,748 for the blower displays, $52,069 for the chain saw displays, and $5,346 for the hedge trimmer displays, for a total of $144,163. Id. The November 18 memorandum stated that these estimates were "based upon every aspect of the job . . . . Shipping charges have been included here. Shipments will be direct to store via Meyer Display."[3] Id. The estimates were based on costs for ground shipping. Moore Dep. at 79.

In late November and early December 2004, Moore and Michal of TTI communicated with Carron of Meyers to monitor whether Meyers could produce the displays in accordance with the anticipated reset schedule for January and February 2005. Michal Dep. [Docket No. 62]

---

[3] The estimates only included Meyers' anticipated charges for producing the displays and shipping them to Home Depot's stores. TTI handled the installation of the displays, and those costs are not at issue.

5

at 39-41.  On December 14, TTI emailed Meyers a copy of the reset schedule.  Dep. Ex. 51 (Desa Ex. E).  Carron was "shocked" by the number of resets scheduled in early January.  Carron Dep. at 95.  Previously, Moore of TTI told Carron that 200 stores per week would be reset during the first two weeks of the reset project, and that the resets would not be needed in stores until mid-January.  Moore Dep. at 158; Carron Dep. at 33, 64-65.  However, the reset schedule provided to Meyers on December 14 provided that 283 stores would be reset during the week of January 2, 2005, 575 during the week of January 9, and 294 during the week of January 16.  Dep. Ex. 51.   On December 22 or 23, 2004, Moore and Michal of TTI and Carron and Tom Kukuk ("Kukuk"), Vice President of Sales at Meyers, participated in a conference call.  Moore Dep. at 87-88.  During the call, Carron and Kukuk disclosed for the first time that Meyers had subcontracted production of the display pods to the Display Center in Missouri.  Id. at 88.  Moore was very surprised, and he feared that Meyers would be unable to meet the reset schedule because Meyers would have less control over the Display Center than Meyers would have had over its own employees.  Id. at 88-89.  The conversation "got loud," but Kukuk told Moore and Michal that he would "turn up the heat" regarding production of the pods.  Id. at 91.  Around this time, Carron asked Moore whether the reset schedule could be modified to reduce the number of resets in early January.  Carron Dep. at 92-94.  Moore responded that Home Depot would not change the reset schedule.  Id.

     To meet the reset schedule, which was further revised based on the needs of Home Depot, Meyers incurred added costs due to overtime labor expenses incurred by the Display Center for production of the pods, and due to expedited shipping of the display kits to Home Depot stores.  Carron Dep. at 39-40, 44-45, 111; Moore Dep. at 110-11, 161.  Kukuk Dep. at

141-43. Instead of shipping the kits by ground, Meyers shipped a substantial number of the display kits by air for next-day or two-day delivery. Carron Dep. at 163-69; Dep. Ex. 65. Kukuk Dep. at 142-43. By early January 2005, Carron of Meyers and Moore of TTI were aware that overtime labor and expedited shipping would increase the Home Depot Vendors' costs for the reset project. Moore Dep. at 107; Carron Dep. at 117-18.

However, neither Meyers nor TTI communicated the increased costs to the other Home Depot Vendors. Kukuk and Carron presumed that TTI, as category captain, had responsibility to communicate with the other Home Depot Vendors and the authority to speak on their behalf. Kukuk Dep. at 80, 159; Carron Dep. at 266. Moore presumed that Meyers, as "the bank," would communicate the increased costs to the Home Depot Vendors. Moore Dep. at 121. Consistent with this understanding, around January 14, 2005, Moore emailed Carron a template letter that Meyers could use to communicate with the Home Depot Vendors. Dep. Exs. 77 (Desa Ex. M), 84 (Desa Ex. M). The template, addressed to Black & Decker, discussed the reset project cost allocation, and stated in part:

> Shipping is the lone variable not included at this time due to the fact that we (Meyers) are in the middle of shipping currently and the original numbers forecast were under-estimated. Each brand will be re-billed their respective percentage for the end-of-project freight charges.
>
> Here is the B&D charge in need of approval so that the January partial billing can commence.

Dep. Ex. 84. The template letter included a chart listing the revised estimated expenses. Id. The chart listed the shipping expense as "not yet available." Id. Meyers did not distribute this letter, and neither Meyers nor TTI communicated with the other Home Depot Vendors regarding the anticipated cost overruns.

7

Before January 2005, Meyers' only contact with the Home Depot Vendors was to solicit credit applications in late November and early December 2004. Kukuk Dep. at 158. On January 12, 2005, Carron discussed Meyers' billing procedures with Kent Ralston ("Ralston") of Desa. Dep. Ex. 106 (Desa Ex. E). Carron and Ralston agreed that Meyers would bill Desa in four equal installments. Id. Meyers sent Desa an invoice dated January 14, 2005, for $22,000, and an invoice dated January 28, 2005, also for $22,000. Dep. Exs. 109 (Desa Ex. E) and 112 (Desa Ex. E). These invoices were consistent with dividing the November 18, 2004, $87,559 estimate of Desa's share of the reset project into four equal invoices. Desa paid these invoices in March 2005. Dep. Ex. 124 (Desa Ex. E). Desa first learned that there might be cost overruns in early March 2005, when Moore gave Ralston a "heads up." Dep. Ex. 117 (Desa Ex. E).

Meyers' communication with Echo was similarly limited. Except for Meyers' solicitation of Echo's credit application, Meyers and Echo had no contact until January 12, 2005, when Carron emailed Dave Korpieski ("Korpieski") of Echo to request a purchase order so Meyers could begin partial billing. Dep. Ex. 8 [Docket No. 54]. On January 25, 2005, Echo faxed Meyers a purchase order for $143,492.88, which corresponded with the November 18, 2004, estimate of Echo's share of the reset project expenses.[4] Dep. Ex. 16 [Docket No. 54]. Echo's purchase order stated:

> Positively no claims or charges will be allowed by Buyer for additional work or material, or for drayage or packing and no substitution of material or changes in price will be permitted except on written authority from the Buyer.

Id. After receiving Echo's purchase order, Meyers issued a January 28, 2005, invoice to Echo

---

[4] The amount is slightly different from the November 18, 2004, estimate of $144,163 because Echo calculated its percentage of the estimated cost to two additional decimal places.

for $48,000. Dep. Ex. 17 [Docket No. 54]. Echo paid the invoice in March 2005. Dep. Ex. 23 [Docket No. 54].

In April 2005, Meyers provided TTI with final production and shipping costs, and TTI determined the pro rata portions of each Home Depot Vendor. Moore Dep. at 115-16. In May 2005, Meyers sent invoices to the Home Depot Vendors. Meyers sent Desa an invoice for $85,413 and an invoice for $101,121. Dep. Ex. 115 (Desa Ex. E). Combined with the January invoices, Desa was billed $230,534 by Meyers for the reset project. Desa paid $44,000 of the May 2005 invoices; combined with its previous payments, Desa paid $88,000, the approximate amount of its November 18, 2004, estimated costs. Desa refused to pay additional amounts, leaving an unpaid balance of $142,534. Meyers sent Echo May 2005 invoices of $155,291 and $158,845. Dep. Exs. 24-26 [Docket No. 54]. Combined with the January invoice, Meyers billed Echo $362,136 for the reset project. In total, Echo paid $143,493, the amount of its purchase order, leaving an unpaid balance of $218,643. All other Home Depot Vendors paid their balances in full.

After unsuccessful efforts to obtain payment from Desa and Echo, Meyers initiated this litigation on December 19, 2005. Meyers asserts claims against Desa and Echo for breach of contract, account stated, and unjust enrichment. Desa and Echo have filed third party complaints impleading TTI.

### III. DISCUSSION

**A.     Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

9

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig, 54 F.3d at 470. The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.     Breach of Contract**

It is undisputed that a contract existed between Meyers and Desa in the amount of the November 18, 2005, estimate of $88,000. Pl.'s Mem. in Opp'n to Summ. J. [Docket No. 64] at 16. Likewise, Meyers and Echo agree that a contract existed between them obligating Echo to pay $143,493 of the total cost of the reset project. However, the parties vigorously dispute whether Desa and Echo are liable for the additional amounts billed by Meyers. Meyers argues that TTI, as category captain of the reset project, was the Home Depot Vendors' agent and therefore it had the implied authority to modify the respective contracts by authorizing overtime and expedited shipping charges. In the alternative, Meyers contends Desa and Echo are liable under theories of apparent authority or agency by estoppel.

**1.     Implied Authority**

"[N]o one can become the agent of another except by the will of the principal," and the principal is bound by the agent's acts "only to the extent of the authority, actual or apparent, which he has conferred upon the agent." Burchard v. Hull, 74 N.W. 163, 164 (Minn. 1898).

"Express authority is that authority which the principal directly grants to the agent. Implied authority includes only those powers which are essential to carry out the duties expressly delegated." Hockemeyer v. Pooler, 130 N.W.2d 367, 377 (Minn. 1964). Additionally, "one who deals with an agent is put to a certain burden of reasonableness and diligence. 'Every person who undertakes to deal with an agent is put on inquiry and must discover whether the agent has the authority to complete the proposed act.'" Truck Crane Serv. Co. v. Barr-Nelson, Inc., 392 N.W.2d 824, 827 (Minn. 1983), quoting W. Concord Conservation Club v. Chilson, 306 N.W.2d 893, 896 (Minn. 1981).

It is undisputed that neither Desa nor Echo authorized TTI to incur the charges for overtime labor and expedited shipping. However, Meyers argues that Desa and Echo each approved or acquiesced in TTI's role as category captain of the reset project, and that TTI's authority to act as category captain carried with it the implied authority to incur the expenses for overtime labor and expedited shipping which obligated Desa and Echo to pay those expenses. Meyers' implied authority argument is based on TTI's status as category captain of the reset project and the fact that TTI received purchase orders from Desa and Echo. See Kukuk Dep. at 159, 190; Carron Dep. at 266.

TTI's duties as category captain of the reset project were not reduced to writing. Kukuk testified that the category captain concept has "been utilized in the retail sector for 15, 20 years," and that typically a retailer "take[s] the largest provider in a particular category and identif[ies] them as a Category Captain, and they [the category captain] take the lead on, usually, a store reset." Kukuk Dep. at 16, 151. Kukuk asserted that a category captain typically has authority to speak on behalf of noncaptain vendors. Id. at 159. Moore of TTI described TTI's category

11

captain responsibilities as "get[ing] a good, suitable working design developed, presented, approved by all parties, produced, and launched" in Home Depot's stores. Moore Dep. at 32. Michal of TTI stated that TTI's role as category captain was to manage the project, "primarily for the benefit of Home Depot," by communicating "executional and logistical" information between Home Depot, the Home Depot Vendors, and Meyers. Michal Dep. at 20.

Meyers contends that by acquiescing in TTI's status as category captain and by submitting purchase order numbers, "Desa and Echo gave TT[I] actual, implied authority to amend the respective contracts to do whatever was necessary and proper to complete the reset schedule." Pl.'s Mem. in Opp'n to Mot. for Summ. J. at 16. In response, Desa and Echo both argue it was unreasonable as a matter of law for Meyers to assume that TTI could amend their respective contracts, especially because TTI, Desa, and Echo are direct competitors. Desa and Echo emphasize that each Home Depot Vendor set up its own account with Meyers. Desa and Echo also argue that Moore's January 14, 2005, email with the draft form letter should have put Meyers on notice that the Home Depot Vendors were unaware of the additional costs being occurred. Additionally, Echo refers to its purchase order of January 25, 2005, which included language that additional amounts must be approved in writing.

On this record, the Court finds there are genuine issues of material fact regarding the scope of TTI's authority to bind Desa and Echo. A fact finder could determine it was unreasonable for Meyers to assume that TTI's role as category captain included authority to obligate its direct competitors to pay for substantial cost overruns. However, based on Kukuk's testimony, there is some support that it is customary for a category captain of a reset project to speak for the other parties involved. There is no evidence that Desa or Echo placed limitations

on TTI's authority when they agreed to participate in the reset project in November 2005. Additionally, the evidence shows that all communications regarding cost estimates were distributed to the Home Depot Vendors by TTI, not Meyers. Therefore, there is a genuine issue of material fact as to whether it was reasonable for Meyers to assume that TTI was communicating with the other Home Depot Vendors when TTI authorized the overtime labor and expedited shipping costs. Summary judgment is denied to Desa and Echo on Meyers' breach of contract claim.

However, the Court finds as a matter of law that Echo's January 25, 2005, purchase order put Meyers on notice of TTI's lack of authority to obligate Echo to future costs (after January 25, 2005) for overtime labor and expedited shipping. As noted above, "one who deals with an agent is put to a certain burden of reasonableness and diligence." Truck Crane Serv. Co., 392 N.W.2d at 827. Echo's purchase order for $142,492.88 unequivocally provided that "no changes in price will be permitted except on written authority from the buyer." Dep. Ex. 16. Regardless of any implied authority inherent in TTI's role as category captain, after Meyers' receipt of Echo's purchase order it was unreasonable as a matter of law for Meyers to continue to believe TTI had implied authority to bind Echo to additional overtime labor and expedited shipping costs beyond the $143,492.88 amount of Echo's invoice.

### 2.     Apparent Authority and Agency by Estoppel

Meyers advances two additional theories in support of its breach of contract claims against Desa and Echo. Meyers first argues Desa and Echo are liable for the full amounts billed to each because each clothed TTI with apparent authority to approve Meyers' overtime labor and expedited shipping costs. "Apparent authority is that authority which a principal holds an agent

out as possessing, or knowingly permits an agent to assume." Foley v. Allard, 427 N.W.2d 647, 652 (Minn. 1988). The elements of apparent authority are:

> The principal must have held the agent out as having authority, or must have knowingly permitted the agent to act on its behalf; furthermore, the party dealing with the agent must have actual knowledge that the agent was held out by the principal as having such authority or had been permitted by the principal to act on its behalf; and the proof of the agent's apparent authority must be found in the conduct of the principal, not the agent.

Hockemeyer, 130 N.W.2d at 375.

For the reasons discussed above regarding Meyers' implied authority argument, there is a genuine issue of material fact regarding whether Echo and Desa held TTI out as having authority to obligate them to pay the overtime labor and expedited shipping expenses. However, as with Meyers' implied authority claim, Echo can not be held liable under a theory of apparent authority for overtime and expedited labor costs incurred by Meyers after Meyers received Echo's January 25, 2005, purchase order.

Meyers also contends Desa and Echo are each liable for their outstanding balances under agency by estoppel. Agency by estoppel "arises . . . where the principal by his culpable negligence permits his agent to exercise powers not granted to him, even though the principal have no notice or knowledge of the conduct of the agent." Dispatch Printing Co. v. Nat'l Bank of Commerce, 124 N.W. 236, 240 (Minn. 1910). Agency by estoppel is very similar to apparent authority, except that "[a]pparent authority is not founded in negligence of the principal, but in the conscious permission of acts beyond the powers granted, whereas the rule of estoppel has its basis in the negligence of the principal in failing properly to supervise and control the affairs of the agent." Id.

Meyers cannot prevail on its agency by estoppel argument because there is no evidence

14

that either Desa or Echo were negligent. Meyers conclusorily asserts that Desa and Echo should have known that TTI approved overtime labor and expedited shipping costs. However, TTI's duties as category captain were to communicate "executional and logistical" information to the other Home Depot Vendors. Thus, Meyers has no basis to argue that Desa and Echo were negligent for not determining that TTI failed to inform them of the use of overtime labor and expedited shipping.

**C.     Account Stated**

Count 2 of Meyers' Complaint asserts a claim for account stated. "An account stated is a manifestation of assent by a debtor and creditor to a stated sum as an accurate computation of an amount due the creditor. A party's retention without objection for an unreasonably long time of a statement of account rendered by the other party is a manifestation of assent." Am. Druggists Ins. v. Thompson Lumber Co., 349 N.W.2d 569, 573 (Minn. Ct. App. 1984). Desa and Echo argue they are entitled to summary judgment on Meyers' account stated claim because they both objected within days of receiving their respective invoices from Meyers in May 2005. See Dep. Exs. 27 [Docket No. 54], 118 (Morris Aff. [Docket Nos. 82-83] Ex. A).

In response, Meyer asserts without citation to the record that TTI, as agent for both Desa and Echo, "approved all of Meyers' invoices including the costs incurred regarding overtime and expedited shipping costs." Pl.'s Mem. in Opp'n to Mot. for Summ. J. at 25. Meyers' brief fails to specify when these alleged invoices where delivered to TTI and whether those invoices specifically stated amounts due from Echo and Desa. Therefore, the undisputed evidence is that Desa and Echo objected to the amounts stated in their respective May 2005 invoices shortly after receiving the invoices. Moreover, Meyers understood that as "the bank" it must look to the

individual Home Depot Vendors for payment, and Desa and Echo each created their own individual accounts with Meyers for billing purposes. Therefore, Meyers' argument that TTI had authority to approve invoices of amounts owed by Desa and Echo is rejected. Desa and Echo are each entitled to summary judgment on Meyers' claims of account stated.

**D.     Unjust Enrichment**

Count 3 of Meyers' Complaint asserts a claim for unjust enrichment. However, "the existence of an express contract precludes recovery under the theories of quasi-contract, unjust enrichment, or quantum meruit." Sterling Capital Advisors v. Herzog, 575 N.W.2d 121, 126 (Minn. Ct. App. 1998). Desa and Meyers agree that a contract existed between them, and Echo and Meyers similarly agree that a contract existed between them. Desa and Echo argue that the express terms of their respective contracts are evidenced by the November 18, 2004, cost estimates and their respective purchase orders. Meyers argues those express terms were modified by TTI's instructions to use overtime labor and expedited shipping. Regardless of which argument prevails, an express contract existed. Therefore, Meyers cannot recover under the theory of unjust enrichment, and Desa and Echo are granted summary judgment on Count 3 of Meyers' Complaint.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.   Defendant Desa, LLC's Motion for Summary Judgment [Docket No. 46] is

    **GRANTED IN PART AND DENIED IN PART**;

2.   Defendant Echo, Incorporated's Motion for Summary Judgment [Docket No. 51]

    is **GRANTED IN PART AND DENIED IN PART**; and

3.   Counts 2 and 3 of the Complaint [Docket No. 1] are **DISMISSED**.

                                                      BY THE COURT:

                                                      s/Ann D. Montgomery
                                                      ANN D. MONTGOMERY
                                                      U.S. DISTRICT JUDGE

Dated:  October 2, 2007.